IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. FISH AND WILDLIFE SERVICE and U.S. FOREST SERVICE,<br><br>    Defendants. | Case No.  4:13-CV-176-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for preliminary injunction filed by plaintiff WWP. The Court heard oral argument on June 19, 2013, and took the motion under advisement. For the reasons explained below, the Court will deny the motion.

## LITIGATION BACKGROUND

WWP alleges that grazing in the Little Lost River watershed is harming bull trout, a species listed as threatened under the Endangered Species Act (ESA). In its original motion, WWP sought to enjoin grazing on two allotments in that watershed, contained within the Salmon-Challis National Forest: (1) Mill Creek and (2) Pass Creek.

Later, WWP withdrew its request as to Mill Creek, relying on the Forest Service's representation that no grazing will be permitted on that allotment until the Fish & Wildlife Service (FWS) issues a new Biological Opinion. Thus, the only allotment at issue is the Pass Creek allotment.

**Memorandum Decision & Order - 1**

# FACTS

The Pass Creek allotment is governed by the Forest Service and lies on the southwest side of the Little Lost River valley. It straddles the Lost River Range, with the southern portion draining south into the Big Lost River watershed and the northern portion draining into Wet Creek, which flows into the Little Lost River. Bull trout have occupied both Wet and Big Creeks on the allotment, although they have not been documented in Big Creek since 1998. The population in Wet Creek is small, with less than 10 individuals observed in recent years.

In 2010, the Forest Service initiated consultation with the FWS over the impacts of grazing on bull trout within the allotment. To start the process, the Forest Service prepared a Biological Assessment for the FWS's review.

At that time, the Forest Service was proposing to authorize grazing 1660 cow/calf pairs between July 15 and October 10 on the allotment. After reviewing the poor condition of much of the allotment, and the predicted impacts of maintaining the same level of grazing as in the past, the Forest Service concluded in its BA that the proposed grazing will "likely limit the ability of the habitat to support Bull Trout."

The FWS reviewed the BA in light of its recovery plan designed to increase populations of the bull trout. Bull trout need cold stream temperatures, clean water free of sediment, plant growth along the bank to shade the water, and well-connected migratory pathways. Recognizing regional variations in the bull trout recovery process, the FWS has grouped different regions into Interim Recovery Units (IRU) for

**Memorandum Decision & Order - 2**

management purposes. The bull trout in this case are part of the Columbia River IRU, which in turn is divided into 90 Core Areas. The bull trout in the Pass Creek allotment are contained in the Little Lost River Core Area.

Within this Core Area, there are ten "local populations" all of which are identified as essential for bull trout recovery. A local population is a group of bull trout that spawns within a particular stream or portion of a stream and is the smallest interacting reproductive unit of bull trout. To recover populations of Columbia River bull trout, the FWS's recovery plan was designed to do the following: (1) maintain or expand the current distribution of the bull trout within Core Areas; (2) maintain stable or increasing trends in bull trout abundance; (3) maintain/ restore suitable habitat conditions for all bull trout life history stages and strategies; and (4) conserve genetic diversity and provide opportunities for genetic exchange.

After reviewing the Forest Service's 2010 BA, the FWS issued a Biological Opinion (BO) in September of 2010. The BO noted that the bull trout population in the Pass Creek allotment has been "trending down over the last 15 years," and that a 2009 survey found no bull trout in Wet Creek. *See 2010 Pass Creek BO* at p. 13. The BO found that "[h]abitat in most of this Allotment . . . does not adequately support essential biological behaviors of bull trout. Most conditions are below objectives for healthy and robust populations." *Id*. at p. 29. The BO estimated that the Forest Service's grazing plan – especially the grazing proposed during August along the Wet Creek spawning sites in the Pine Creek pasture – could trample one redd and affect two adult bull trout. *Id.* at p.

**Memorandum Decision & Order - 3**

21.

The FWS concluded that "these local populations are important to maintaining overall production and distribution of bull trout in the Little Lost river Core Area." *Id.* Nevertheless, the FWS found that the trampling of a single redd, and the potential impacts to two bull trout, were "unlikely to be incompatible with sustaining the two local populations as viable populations of bull trout." *Id*. at p. 29.  On a broader scale, the FWS concluded that there was no threat to the "coterminous U.S. population" because (1) the Little Lost River Core Area is "not geographically connected to the rest of the Columbia River Recovery unit," and (2) the small numbers of bull trout affected in Wet Creek were insignificant in comparison with the total numbers of bull trout in Idaho. *Id*. at pp. 29-30.

With this approval from the FWS, the Forest Service proceeded to implement its grazing plan on the Pass Creek allotment in 2010. In addition, to boost the numbers of bull trout, the Forest Service transplanted 161 bull trout into Wet Creek in 2010. *See Gamett Declaration (Dkt. No. 49-1)* at p. 4.

Since that time, the Forest Service has been monitoring both the numbers of bull trout in Wet Creek and the condition of the allotment in general. Monitoring has revealed that some conditions on the allotment have improved while others have deteriorated. For example, in 2012, the Forest Service found that livestock were getting through fences designed to keep them out of spawning areas of Wet Creek, and concluded that these trespasses have "likely impacted the ability of habitat within the exclosure to support Bull

**Memorandum Decision & Order - 4**

Trout." At the same time, the bank stability along Wet Creek shows "a generally improving trend at [monitoring] locations since 2009." *See Forest Service BA (Dkt. No. 38-1)* at p. 3. The bull trout found in Wet Creek have increased from zero in 2009 to 4 in 2012. *Id.* at figure 1.

Due to these changed circumstances on the allotment, the Forest Service reinitiated consultation with the FWS in May of 2013. The Forest Service is preparing a new Biological Assessment to be submitted to the FWS once the 2013 grazing season is over. The Forest Service states that it intends to propose a different grazing management strategy for the FWS to evaluate after the 2013 grazing season but prior to the 2014 grazing season.

In the meantime, the Forest Service has adjusted grazing on the two pastures – or "units" – within the Pass Creek allotment that contain bull trout habitat. On one of those units – the Wet Creek unit – no grazing will be permitted. On the other – the Pine Creek unit – grazing will be limited to 5 days of livestock trailing through a quarter-mile section of Wet Creek.

One day of trailing has already occurred on June 1, 2013. Trailing is also planned for July 15, 2013, and August 8-10, 2013. The trailing is intended to occur before the mid-August spawning season begins. During the July 15th trailing, 231 cow/calf pairs will be trailed. During the August trailing, 1471 pairs will be trailed. To ensure that the cattle do not stray off course, the Forest Service requires that an additional two riders accompany the trailing.

**Memorandum Decision & Order - 5**

On May 30, 2013, the Forest Service made a finding under § 7(d) of the ESA that the newly proposed grazing plan would not jeopardize the continued existence of bull trout.  *See § 7(d) Determination (Dkt. No. 38-1).*  To reach that conclusion, the Forest Service reasoned that (1) the trailing will occur before August 15th, the typical start of spawning; (2) the requirements for habitat health – measured by stubble height, woody browse, and stream bank stability – will be enhanced and strictly enforced; (3) two extra riders will accompany the trailing to ensure that cattle do not stray off the planned route, and (4) the quarter-mile crossing site constitutes just 5% of the total length of Wet Creek in the allotment.  Given this, the Forest Service concluded that the impact on bull trout would be "insignificant" and "will not reach a level considered to be adverse."  *Id.* at p. 9.

WWP claims that the Forest Service violated § 7 and § 9 of the ESA when it authorized the trailing of cattle over Wet Creek.  Section 7(d) prevents agencies, while consulting with the FWS, from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section."  *See* 16 U.S.C. § 1536(d).  "Section 7(d) was enacted to ensure that the status quo would be maintained during the consultation process, to prevent agencies from sinking resources into a project in order to ensure its completion regardless of its impacts on endangered species."  *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1034-35 (9th Cir. 2005).  Section 9 of the ESA makes it unlawful for any person to "take" a listed species.  *See* 16 U.S.C.§

**Memorandum Decision & Order - 6**

1538(a)(1)(B).  The term "take" is defined to mean "harass, harm, pursue, . . . or collect, or to attempt to engage in any such conduct." *See* 16 U.S.C. § 1532(19).  WWP claims that the trailing violates both § 7(d) and § 9 by disrupting bull trout spawning on Wet Creek as nearly 3,000 cattle trample the spawning grounds just days prior to the start of spawning.  In the motion now before the Court, WWP seeks to enjoin the trailing.

## LEGAL STANDARDS

The Ninth Circuit recently considered a request for injunctive relief as a remedy for alleged ESA violations.  *See, Conservation Congress v. U.S. Forest Service*, 2013 WL 2631449 (9th Cir. June 13, 2013).  The Circuit, citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), held that a preliminary injunction is an "extraordinary remedy," requiring the movant to show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest.  *Id.* at *4.

The Circuit did not cite or discuss a line of Circuit authority – predating *Winter* – holding that the "traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA."  *Nat. Wildlife Fedn. v. NMFS*, 422 F.3d 782, 793 (9th Cir.2005).  For example, those cases held that the courts need not "balance interests in protecting endangered species against the costs of the injunction when crafting its scope," because the balance of hardships always favors the threatened species.  *Wash. Toxics Coalition*, 413 F.3d at 1035.  Those cases also put the threshold burden on the agency to show that their action would not likely cause harm to the listed species.  *Id.* (holding that

**Memorandum Decision & Order - 7**

"[p]lacing the burden on the acting agency to prove the action is non-jeopardizing is consistent with the purpose of the ESA . . ."). Because the Circuit did not discuss this line of case law in *Conservation Congress*, and merely cited *Winter's* injunction test, it remains unclear whether that line survived *Winter*. In the absence of any express overruling, however, the Court will assume that line of cases is still good law, and will apply it here.

WWP brings its claims under the ESA's citizen suit provisions, which authorize any person or private entity to bring suit to enjoin violations of the ESA. *See* 16 U.S.C. § 1540(g). The standard of review, and the scope of review, were both discussed in *Western Watersheds Project v Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011). Because the ESA does not establish a *standard* of review, the courts have borrowed the "arbitrary and capricious" standard from the APA. *Id*. at 496. But the courts have not similarly borrowed the APA's *scope* of review that prohibits consideration of material outside the administrative record: "[B]ecause the ESA provides a citizen suit remedy . . . we may consider evidence outside the administrative record for the limited purpose of reviewing plaintiffs' ESA claim." *Id.* at 497.

Bringing all these standards together, the Forest Service has the burden of showing that the trailing over Wet Creek is not likely to jeopardize the bull trout. The Court evaluates that showing under the APA's arbitrary and capricious standard. "A decision is arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an

**Memorandum Decision & Order - 8**

explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Conservation Congress,* 2013 WL 2631449 at *4.  "Agency action is valid if the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.*  Moreover, when reviewing scientific judgments and technical analyses within the agency's expertise, the reviewing court must be at its "most deferential." *Id.*

## ANALYSIS

Initially, the Court rejects the Forest Service's argument that the case is moot.  The agency has authorized grazing that WWP alleges will jeopardize a threatened species under the ESA.  The agency has taken action with consequences that have not abated, and hence this case is not moot.  *See Center for Biological Diversity v U.S. Forest Service*, 820 F.Supp. 2d 1029 (D. Ariz. 2011) (rejecting Forest Service mootness argument where plaintiff alleged grazing violated ESA).[1]

The key issue is whether the Forest Service has carried its burden of showing that the trailing is not likely to jeopardize bull trout.  In its § 7(d) determination, as discussed earlier, the Forest Service found no jeopardy because the quarter-mile of Wet Creek to be crossed by the cattle constitutes only 5% of the total length of the Creek in the allotment.

---

[1] The Forest Service also argues that WWP was not diligent in filing this action.  The Court disagrees, finding persuasive the showing of diligence by WWP's counsel in her Declaration.  *See Ruether Declaration (Second)(Dkt. No. 47).*

**Memorandum Decision & Order - 9**

But while this section of Wet Creek is short, it is contained within the 1.2 mile stretch of Wet Creek that the FWS identified in its 2010 BO as potential bull trout spawning grounds.  *AR* at 8349, 8382; *see also Gamett Declaration (Dkt. No. 49-1)* at ¶ 7 ("the section of Wet Creek where livestock trail across is within the 2010 [BO] potential spawning reach").  In its § 7(d) determination, the Forest Service did not discuss the potential impact of trailing nearly 3,000 cattle over these spawning grounds just days before spawning would begin on August 15th.

Recognizing that gap in the record, the Forest Service filed the Declarations of (1) Bart Gamett, the agency's Fisheries Biologist for the Salmon-Challis National Forest, (2) Diane Weaver, the District Ranger for the Lost River Ranger District in the Forest, and (3) Lee Jacobson, the Program Manager for the Region's listed species and the author of the § 7(d) determination.

In addressing the trailing over these spawning grounds, Gamett points out that surveys in 2010 and 2012 found no bull trout redds in this stretch of Wet Creek.  *Id*. at ¶ 6.  Moreover, a fish population assessment conducted on July 25, 2011, found no bull trout in that stretch of Wet Creek.  *Id.*  The spawning that does take place on Wet Creek occurs a mile upstream from the trailing site, according to Gamett.  *Id*. at ¶ 8.  With respect to the trailing site, Gamett concludes that "no spawning actually occurs within this section of Wet Creek" and thus the trailing "will likely not impact bull trout spawning or spawning habitat . . . ."  *Id*. at ¶ 7.  Even if some bull trout do decide to spawn there, the trailing will occur prior to spawning and any bull trout in the area "can seek out cover or

**Memorandum Decision & Order - 10**

move out of the trailing area and return to normal activity once the livestock trailing is completed.  Since bull trout avoid large animals wading through the stream the likelihood of livestock stepping on bull trout is extremely small." *Id*. at ¶ 9.  Gamett concludes that the trailing will have no adverse impact on the bull trout. *Id.*

The author of the Forest Service's § 7(d) determination – Lee Jacobson – agrees with Gamett.  Jacobson states that "few, if any, bull trout are expected at the Wet Creek stream crossing area" during the July and August crossings. *See Jacobson Declaration (Dkt. No. 34)* at ¶ 8.  From this, he concludes that it is "unlikely" that bull trout will be "disturbed" or "trampled" during the trailing. *Id.*

WWP disagrees.  To show the historic numbers of bull trout, and to highlight the deterioration of conditions, WWP filed a 1996 monitoring study finding 27 bull trout in this stretch of Wet Creek. *See Fishery Management Annual Report (Dkt. No. 53-1)* at p. 11.  In addition, a monitoring study in 1999 found three bull trout at the trailing site on August 6, 1999, a date just two days before the August trailing will begin. *See Pass AR 9499 at 9502.*

WWP also filed the Declaration of Laurence Zuckerman who worked as a Fisheries Biologist for the FWS, among other agencies. *See Zuckerman Declaration (Dkt. No. 10)* at ¶ 2.  He states that bull trout will "stage" in the spawning area up to a month before August 15th at the females dig "test redds" to determine if the substrate is adequate. *See Zuckerman Declaration (Second)(Dkt. No. 46)* at ¶ 8.  He concludes that trailing nearly 3,000 cattle over this area in early August "would make it very likely that

**Memorandum Decision & Order - 11**

any staging bull trout would be disturbed to such extent that it would abandon the area, undergo significant stress that would impair its spawning and reproductive success, or even be harmed or killed directly by cattle hooves." *Id*. at ¶ 9. He is also concerned about grazing on other pastures within the allotment along tributaries that flow into Wet Creek. That grazing dumps sediment into the tributaries that eventually finds its way into Wet Creek, and can also result in drying up the tributaries.

The Forest Service takes issue with these conclusions about grazing on other pastures. While the Forest Service did authorize essentially the same number of cattle on the allotment in 2013 as 2012, it also imposed more restrictive use standards to govern criteria such as stubble height, woody browse, and stream bank alteration. *See Weaver Declaration (Second)(Dkt. No. 49-2)* at ¶¶ 6. These use standards should be the focus, rather than the total head of cattle, according to District Ranger Diane Weaver. *Id*. She concludes that the use standards will protect the allotment because "[o]nce these specified levels of use are reached, livestock must be removed from the area . . . ." *Id*. at ¶¶ 6, 8. She predicts that these standards, in combination with the drought, will mean that cattle will be moved "more quickly" through the pastures and be removed early. *Id*. at ¶ 6. With regard to the effect of grazing on tributaries to Wet Creek, Weaver concludes that Basin Creek will probably not flow all the way to Wet Creek in 2013 because of the drought, not because of any grazing-caused problems. *Id*. at ¶ 9. Gamett likewise concludes that while grazing in these other units may have some impact on tributaries, "the small size of many of these tributaries and their relative distance from Wet Creek

**Memorandum Decision & Order - 12**

[makes] it is unlikely that these impacts will adversely affect bull trout or occupied bull trout habitat in Wet Creek." *Gamett Declaration, supra*, at ¶ 15.

The Court is faced with conflicting expert opinions. Both sides support their opinions with well-reasoned analysis and monitoring data. Under these circumstances, the Court's role is not to select the outcome it deems "best." *Lands Council v. McNair*, 537 F.3d 981, 996 (9th Cir.2008) (en banc), overruled in part on other grounds by *Winter*, *supra*. The standard of review "requires [the Court] to defer to an agency's determination in an area involving a 'high level of technical expertise.'" *Id.; see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185 (9th Cir. 2011) (holding that "Forest Service is entitled to rely on the reasoned opinions of its experts"). Under the arbitrary and capricious standard, the agency's decision must be upheld if "there is a rational connection between the facts found and the conclusions made," and the determination was "not so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. at 987.

Obviously, trailing nearly 3,000 cattle over Wet Creek will have a substantial impact on that stretch of Wet Creek. The trampling will crush anything underfoot, raising sediment levels along with water temperatures. But the Forest Service experts conclude that the bull trout will not be put in jeopardy because (1) the trailing occurs prior to spawning, (2) no spawning takes place in that stretch of Wet Creek, (3) the spawning takes place about a mile upstream and so will not be affected by the trampling, and (4) the grazing on other units will not affect Wet Creek.

**Memorandum Decision & Order - 13**

The destruction of an insignificant portion of habitat for a listed species does not necessarily support injunctive relief. *See Conservation Congress,* 2013 WL 2631449 at *8 (rejecting injunctive relief where plaintiff "fail[ed] to explain how the alteration to 68 acres of the Owl's foraging habitat will appreciably diminish the Owl's broader foraging habitat"); *Butte Environmental Council v. U.S. Army Corp of Engineers*, 620 F.3d 936, 948 (9th Cir. 2010) (holding that "[a]n area of a species' critical habitat can be destroyed without appreciably diminishing the value of critical habitat for the species' survival or recovery").

The opinions of the Forest Service experts that the effects of trailing will be insignificant are reasoned and supported by some of the monitoring data; there is a rational connection between the facts and their conclusions. The opinions are not so implausible that they must be the result of something other than the application of agency expertise.

It is true that the required rational connection was not made in the § 7(d) determination, which ignored the FWS's earlier designation of this stretch of Wet Creek as spawning grounds. But the connection was made in the Declarations submitted to the Court, and discussed above, demonstrating that spawning is unlikely in the trailing area. The Court may rely on such extra-record material in this proceeding. *Kraayenbrink*, 632 F.3d at 497 (holding that the courts "may consider evidence outside the administrative

**Memorandum Decision & Order - 14**

record for the limited purpose of reviewing plaintiffs' ESA claim").[2]

For all of these reasons, the Court will deny WWP's motion for preliminary injunction.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for preliminary injunction (docket no. 7) is DENIED.

IT IS FURTHER ORDERED, that the motions to strike (docket nos. 43 & 49) are DENIED.

DATED: **June 26, 2013**

Honorable B. Lynn Winmill
Chief U. S. District Judge

---

[2] The Forest Service filed two motions to strike extra-record material submitted by WWP. The Court has examined the material and relied on it in this decision, finding that extra-record material may be examined. In addition, the Court has relied upon the extra-record material submitted by the Forest Service. At any rate, the Court will deny both motions.

**Memorandum Decision & Order - 15**