IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. FISH AND WILDLIFE SERVICE and U.S. FOREST SERVICE,<br><br>    Defendants.<br><br>ROCKY & CAROL ROSS, DONALD & BILLIE PHILLIPS,<br><br>    Defendant-Intervenors. | Case No. 4:13-CV-176-BLW<br><br>**MEMORANDUM DECISION** |

# INTRODUCTION

The Court has before it cross motions for summary judgment filed by all parties and the intervenors. The Court heard oral argument and took the motions under advisement. For the reasons set forth below, the Court will grant the motions filed by defendants and intervenors, and deny the motion filed by plaintiff WWP.

# LITIGATION BACKGROUND

The Forest Service manages grazing on the Mill Creek and Pass Creek allotments while the BLM manages grazing on the Hawley Mountain allotment. All three allotments contain bull trout, a threatened species under the Endangered Species Act (ESA). The bull trout that exists in this region – the Little Lost River watershed – is a genetically unique species.

**Memorandum Decision – page 1**

In drafting grazing plans, the agencies examined the impact of the proposed grazing on bull trout. The Forest Service concluded that on the Mill Creek allotment and the Pass Creek allotment, the grazing plans may affect the bull trout, and so the agency prepared a Biological Assessment (BA) and consulted with the Fish and Wildlife Service concerning those impacts. The BLM concluded that its grazing plan was not likely to adversely affect bull trout. It prepared a BA for the FWS's review supporting that conclusion.

The FWS reviewed the BAs, and prepared Biological Opinions (BOs) for the Mill Creek and Pass Creek allotments, and a Letter of Concurrence (LOC) for the Hawley Mountain allotment. In the BOs, the FWS approved the grazing plans and found that they would not jeopardize the bull trout or adversely affect its habitat. In the LOC, the FWS concurred in the BLM's conclusion that the grazing plan would not adversely affect the bull trout or its habitat.

In this lawsuit, WWP challenges the approvals by the FWS, and the grazing management of the Forest Service; WWP has not sued the BLM. WWP argues that the FWS's approval of the grazing plans violates the ESA, that the Forest Service failed to develop grazing plans that avoid jeopardizing the bull trout, and that the Forest Service's grazing management results in the "take" or death of bull trout.

More specifically, WWP challenges three approvals: (1) FWS's 2010 Biological Opinion approving proposed grazing on the Forest Service's Pass Creek allotment; (2) FWS's 2013 Biological Opinion approving proposed grazing on the Forest Service's Mill Creek allotment; and (3) FWS's 2013 Letter of Concurrence (LOC) approving proposed

grazing on the Forest Service's Hawley Mountain allotment. The permit holders on the Mill Creek allotment – Rocky and Carol Ross and Donald and Billie Phillips – have intervened in this case.

WWP also alleges that the Forest Service violated § 7 and § 9 of the Endangered Species Act (ESA) by, respectively, (1) jeopardizing the existence of bull trout, and (2) causing the take of bull trout by issuing permits for grazing on the allotments under its stewardship.

WWP's complaint contains five causes of action: (1) The FWS BO for the Mill Creek allotment violates the ESA; (2) The Forest Service grazing decisions violated the ESA on the Mill Creek allotment; (3) The FWS BO for the Pass Creek allotment violates the ESA; (4) The Forest Service grazing decisions violated the ESA on the Pass Creek allotment; and (5) The FWS LOC for the Hawley Mountain allotment violates the ESA. The parties have filed cross motions for summary judgment on all these claims.

Before reviewing the facts concerning each of the three allotments challenged by WWP, the Court finds first that the challenge to one of those allotments is moot. About a year after this lawsuit was filed, the FWS issued a new BO for the Pass Creek allotment. The current cross motions for summary judgment all address the 2010 FWS BO for the Pass Creek allotment, but that document is completely superseded and replaced by the 2014 FWS BO. It is well-established that "the issuance of a superseding [Biological Opinion] moots issues . . . relating to the preceding [Biological Opinion]." *Grand Canyon Trust v. U.S. FWS,* 691 F.3d 1008, 1017 (9th Cir. 2012) (holding that challenges under the ESA to the FWS's 2009 Biological Opinion was mooted by the issuance of a

**Memorandum Decision – page 3**

2011 Biological Opinion). The Court will therefore dismiss the challenges to the 2010 Pass Creek BO, which will involve dismissing Counts Three and Four of the complaint. The only two allotments at issue now are the Mill Creek allotment and the Hawley Mountain allotment.

## FACTS

### Mill Creek Allotment

The Mill Creek allotment contains over 50,000 acres, located primarily in the Sawmill Canyon watershed. The allotment contains more bull trout than any other area in the Little Lost River Core Area. The Forest Service BA and the FWS BO note that "bull trout are widely and relatively abundant across the allotment . . . ." *See FWS BO* at 28. They estimate that "95 percent of the bull trout in the Little Lost River basin occur in this area. *Id.* Spawning occurs in 29.5 miles of streams, including Squaw Creek, Mill Creek, Smithie Fork, and Timber Creek. Seven of the ten local populations within the Little Lost River Core Area are found in this allotment. *Id.* at 29.

The largest threats to bull trout on this allotment are brook trout and grazing. *Id.* at 35. Grazing is managed by the Forest Service, and it rotates cattle among six pastures. Up to 554 cow/calf pairs are authorized to graze the allotment from July 1 to September 30. Movements of cattle from one pasture to another would be triggered by designated indicators such as stubble height, stream bank alteration, browse use, etc.

Trends in bull trout abundance across the allotment are mixed. *Id.* at 29. In 2011 and 2012, bull trout densities increased at 5 sites, decreased at 2 sites and remained static at one site. *Id.* Although the FWS found that the proposed grazing would not likely lead

**Memorandum Decision – page 4**

to any additional increases in water temperature, the agency found that "past livestock grazing has likely increased stream temperatures on this allotment, contributing to the ability of brook trout to out-compete bull trout." *Id.* While brook trout are a serious threat, the FWS found that the Forest Service is "working to contain the spread of brook trout through barrier, physical removal, and "changes in livestock management leading to improving stream conditions." *Id.* at 30. In addition, the Forest Service is working with Trout Unlimited to tag and monitor brook trout to evaluate the effectiveness of barriers. Turning to grazing impacts, the FWS BO concludes that "recent livestock management on the allotment has resulted in many bull trout habitat conditions trending upward or meeting objectives." *Id.*

The FWS BO labels the grazing levels on this allotment as "light to medium" given the 4 to 6 inch stubble height requirement imposed by the Forest Service. This level of grazing, the FWS concluded, should improve habitat by narrowing and deepening streams, increase stream bank stability, and generate more vegetation growth along the streams. *Id.* at 43. The BO concludes that the grazing level "is consistent with maintaining habitat in a suitable condition to maintain stable fish numbers or to potentially improve numbers in areas that have been negatively impacted by past heavy grazing." *Id.*

The BO reaches that conclusion based on its evaluation of various different impacts caused by grazing. For example, after a detailed discussion of grazing's impact on spawning, the BO concludes that the grazing plan would not negatively affect spawning behavior or population numbers. *Id.* at 48-50. The width-to-depth ratios of

**Memorandum Decision – page 5**

most streams – an important factor in ease of migration – currently "meet requirements for the bull trout," and the RHCA conditions are also at or near late seral condition, an important factor in developing shade (to help lower water temperature) and increase pools, undercut banks, and woody debris (to increase food sources and hiding places). *Id.* at 59. At the same time, sediment levels and water temperatures in most streams "do not fully meet the requirements for the bull trout." *Id.*

Again – like the conditions in the Pass Creek allotment – the conditions here are a mixed bag. The BO notes that past grazing impacts continue to damage habitat but that conditions "are improving due to modification of grazing practices on the allotment." *Id.* at 62. The improvement will be slow, but will support "persistent bull trout populations on the allotment, notwithstanding the significant threat caused by the presence of the brook trout on streams on the allotment." *Id.* at 64. To ensure the improvement of habitat, the BO imposes additional conditions on the Forest Service requiring monitoring of certain spawning sites, and continuation of efforts to remove brook trout, including an annual requirement that the Forest Service report its efforts to the FWS.

**<u>Hawley Mountain Allotment</u>**

The Hawley Mountain allotment encompasses 58,490 acres, the vast majority of which is managed by the BLM. The BLM has instituted a rotational grazing system authorizing grazing for about 770 cattle and 10 horses on 18 pastures.

Bull trout occur in 6 streams. Portions of Sawmill Creek and Warm Creek are deemed critical habitat for the bull trout. Sawmill Creek is important as bull trout

feeding, migrating, and overwintering habitat. Warm Creek is important as bull trout spawning habitat.

Habitat conditions in Sawmill Creek "have improved dramatically over the past 11 years, under the same grazing regime as proposed." *Id.* at 4. Channel complexity, pool development, bank stability and cover, and riparian zone development have all been improving on Sawmill Creek. *Id.* at 11. The only criteria not functioning properly is water temperature, *id.* at 8, but grazing is not the cause: "[C]urrent grazing practices on the allotment do not appear to be adversely affecting water temperature in streams occupied by bull trout in the action area." *Id.* at 3. The region is simply hot, and water temperature is being affected by natural conditions. *Id.*

The other critical habitat lies on Warm Creek. It "contains suitable habitat for bull trout spawning." *Id.* at 8. Dense vegetation along the stream bank limits livestock access and minimizes sedimentation. *Id.* Less than 5% of Warm Creek is accessible by livestock due to dense vegetation. *Id.* Moreover, the BLM's grazing plan allows cattle to graze areas near bull trout streams only in the spring, or in a few cases, the winter. *Id.* at 7. The cooler temperatures during these seasons results in less use by cattle of the riparian areas and minimizes sedimentation and bank trampling. *Id.*

The FWS concluded that with regard to the critical habitat on Sawmill Creek and Warm Creek, the proposed BLM grazing plan would have only "insignificant or discountable" effects on the habitat. *Id.* at 11.

The FWS also evaluated the other streams on the allotment. For example, the FWS found that only 10% of Badger Creek was accessible to livestock due to dense

**Memorandum Decision – page 7**

vegetation along the stream banks. While the FWS does not believe spawning is taking place on Badger Creek, its water temperature is suitable for spawning. *Id.* at 8. The FWS concluded that adverse effects from livestock grazing are not likely to occur. *Id.* That is the same result reached for all of the streams evaluated. *Id.* at 9-10.

Based on these evaluations, the FWS concurred with the BLM that the proposed grazing was not likely to adversely affect bull trout or its designated critical habitat. *Id.* at 12.

## STANDARD OF REVIEW

### WWP's ESA Claims

The ESA does not supply a separate standard of review, so the Court reviews ESA claims under the standards of the APA. *San Luis & Delta-Mendota Water Authority v. Jewell,* 747 F.3d 581 (9th Cir. 2014). Section 706(2) of the APA provides that an agency action must be upheld on review unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis,* 747 F.3d at 601. Although the Court's inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity," and the Court may not substitute its judgment for that of the agency. *Id.* Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence." *Id.* Even "[i]f the

evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings." *Id.*

Under the ESA, the agency must base its actions on evidence supported by "the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8); 16 U.S.C. § 1536(a)(2). The determination of what constitutes the "best scientific data available" belongs to the agency's "special expertise . . . . When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *San Luis,* 747 F.3d at 602. "Absent superior data[,] occasional imperfections do not violate" the ESA best available standard. *Id.*

Section 7 of the ESA requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species ..." 16 U.S.C. § 1536(a)(2). In order to achieve this objective, the agency proposing the action must formally consult with the FWS whenever its action "may affect" a threatened or endangered species. 50 C.F.R. § 402.14(a). Formal consultation is completed by the issuance of a BO by the consulting agency assessing whether the proposed action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." *See* 50 C.F.R. § 402.14(h)(3), (1)(1). The BO must include "a summary of the information on which the opinion is based" and "a detailed discussion of the effects of the action on listed species or critical habitat." *See* 50 C.F.R. § 402.14(h)(1), (2). Both the action agency and the consulting agency must use the "best scientific and commercial

data available" during the consultation process and in drafting the BO. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).

# ANALYSIS[1]

**Scope of Agency Analysis**

WWP argues that the FWS "considered baseline effects only on the allotments themselves, or on very short lengths downstream, and that this improperly ignored the context of the action." *See Reply Brief (Dkt. No. 107)* at p. 5. WWP argues further that the FWS failed to address "downstream effects." *Id.* at p. 6. The Court disagrees for each of the three FWS decisions at issue here.

In the Hawley Mountain LOC, the FWS considered whether grazing upstream in the Mill Creek allotment was affecting riparian conditions downstream in the Hawley Mountain allotment. *See Hawley Mountain LOC, supra,* at p. 3. Monitoring showed that all reaches of Sawmill and Warm Creeks are rated as in proper functioning condition, meaning that riparian vegetation, channel characteristics, and stream hydrology are all in good order. *Id.* The FWS concluded that "[t]here is no other evidence that livestock grazing in Mill Creek allotment is affecting baseline conditions in [the Hawley Mountain allotment]." *Id.* Thus, the FWS did examine how grazing in one allotment might affect another.

---

[1] The Government argues that WWP lacks standing. The Court disagrees; WWP's affidavits establish its standing.

In addition, the FWS also focused on conditions outside the allotments at issue. The LOC states that the BLM's BA is "incorporated by reference." *Id.* at p. 1. That BLM BA was an addendum to the 1998 Little Lost River Watershed Biological Assessment, which provides an evaluation of bull trout throughout the Little Lost River watershed. Moreover, in the Mill Creek BO, the FWS stated that it reviewed Opinions discussing bull trout recovery in 8 bull trout recovery core areas, including the Little Lost River Core Area. *See Mill Creek BO, supra,* at 26. In drafting the Mill Creek BO, the FWS reviewed 61 Opinions. *Id.* The BO contains an extensive discussion of the bull trout in the Little Lost River Core Area. It is clear, therefore, that the FWS was not too narrow in its focus.

**Adequacy of Mitigation Measures**

WWP argues next that the mitigation measures proposed by the Forest Service and BLM – and relied upon by the FWS – have been shown to be inadequate in the past and cannot be found to mitigate the impacts of grazing. Mitigation measures "must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biol. Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1152 (D. Ariz. 2002).

In this case, the mitigation measures pass that test. The grazing plans have 4 to 6 inch stubble height requirements, stream bank stability criteria, and browse standards, all of which are supported by the scientific literature as critical methods to reduce grazing's

**Memorandum Decision – page 11**

impacts. *See e.g. Mill Creek BO* at 51 (citing scientific literature to support stream bank stability criteria). Spawning grounds are protected either by fencing or rotations that remove cattle during spawning periods. Riparian areas are also protected by rotations that put cattle near water during the cooler season when they will be less likely to seek water.

The record shows the Forest Service and BLM are monitoring these standards and taking action to deal with non-compliance. For example, the monitoring for the Mill Creek allotment shows that for more than a decade the Forest Service has been monitoring critical criteria such as stubble height, bank stability, woody plants per acre data, and sediment loading. *See 3rd Supp. PAR at 1333.* For over a decade, the Forest Service has been taking photos of certain sites for comparison purposes to monitor improvements in conditions. *Id.* The Forest Service is not only monitoring but also taking action to deal with non-compliance. *See USFS PAR* 9668, 9670, 9674, 9678, 9682, 9688, 9694, 9698, 9729, 9734, 9739; *see also*, *USFS 3rd Supp. PAR* 3951, 3956, 3961, 3987, 3992, 4032, 4058, 4060, 4062, 4080. The Forest Service monitoring on the Hawley Mountain allotment is similarly extensive. *See Hawley Mountain Supp. PAR at SUP0013 to SUP0002; see also, Hawley Mountain BA at Tables 7, 8 & 9.*

These monitoring and enforcement efforts of the Forest Service and the BLM have not been unsuccessful as WWP argues. For example, on the Hawley Mountain allotment, the BLM's grazing restrictions have improved conditions "dramatically" over the last 11 years, as discussed above. As another example, the Smithie Fork Unit on the Mill Creek allotment was denuded by a large fire in 1988, but recovery measures have promoted

**Memorandum Decision – page 12**

vegetation growth, and the bull trout densities are now among the highest in the entire range.  *See 3rd Supp. Partial Administrative Record at 1333, p. 10.*

Certainly there are mitigation measures that have failed.  But the record shows that the Forest Service and BLM are engaged in a serious and consistent effort to reduce grazing's impacts and recover the bull trout.  The Court cannot find that the FWS was arbitrary or capricious in relying on the mitigation measures of the Forest Service and BLM.

**<u>Water Withdrawals</u>**

WWP argues that the FWS failed to consider the water withdrawn from streams and other sources on the allotments for grazing purposes in determining whether the proposed grazing plans jeopardized bull trout.  WWP supports its argument by listing dozens of stockwater water rights that are only issued if the water diverted is for watering livestock.  *See Marvel Declaration (Dkt. No. 8).*  For example, WWP was able to find 88 water rights on the Mill Creek allotment.

The right of ranchers to withdraw water from the streams in these allotments is a relevant factor in determining whether the grazing plans will result in jeopardy to bull trout or adversely modify their critical habitat.  *Center for Biological Diversity v. U.S. BLM,* 698 F.3d 1101, 1124 (9th Cir. 2012).  The FWS discussed withdrawals in its Mill Creek BO – and reviewed the Forest Service's discussion of withdrawals in the BA – and concluded that it was not significant.  *See Mill Creek BO* at 33, 39 & 58.  In the Hawley Mountain LOC, the FWS discussed water quantity in the context of critical bull trout habitat.  To determine the condition of critical habitat, the Forest Service takes the

**Memorandum Decision – page 13**

measure of six Primary Constituent Elements (PCE) as a proxy for habitat health. The first of these PCEs measures, among other things, water quantity. The FWS found that for the critical bull trout habitat on the Hawley Mountain allotment, the water quantity PEC was rated as functionally supporting bull trout recovery. *See Hawley Mountain LOC* at 4. In addition, the Hawley Mountain BA states that "[w]ater quantity is reduced slightly due to irrigation withdrawals, but still provides a base flow suitable to maintain all life stages of bull trout. This will not change with the grazing proposed." *See Hawley Mountain BA* at 28. The FWS could rely on this conclusion by the Forest Service.

These discussions show that the FWS did not neglect water withdrawals, and that the managing agencies – the BLM and Forest Service – also took them into account. WWP argues, however, that its calculations demonstrated that the water rights would authorize a substantial withdrawal, and that the agencies ignored the size of the withdrawal. However, WWP did concede errors in its calculations, *see WWP Reply Brief (Dkt. No. 107)* at 8, and never responded to the Forest Service's calculation showing that the amount of the withdrawals was insignificant. *See Casterson Declaration (Dkt. No. 93).* The Court cannot find any shortcoming in the agency decisions regarding water withdrawals.

**Adverse Modification Issue**

In addition to requiring the FWS to determine whether the grazing plans will jeopardize the existence of bull trout, the ESA also requires the FWS to determine whether the grazing plans will result in the "adverse modification" of designated critical habitat of the bull trout. *See* 16 U.S.C. § 1536. WWP argues that the conclusion in the

**Memorandum Decision – page 14**

FWS BO for the Mill Creek allotment that the grazing plan will not adversely modify critical habitat is arbitrary and capricious and without rational connection to the facts.

WWP points out that an adverse modification that would appreciably diminish the value of critical habitat for either survival or recovery of the bull trout is sufficient to violate the ESA. *See Gifford Pinchot Task Force v. U.S. FWS,* 378 F.3d 1059, 1069 (9th Cir. 2004). WWP points out that the reports show that much of the critical habitat lacks functionality and that grazing will cause further degradation.

The record, however, does not support WWP's claim of widespread degradation on the Mill Creek allotment. It is home to an abundant population of bull trout, and the Smithie Fork Unit has some of the highest densities in the entire range, as discussed above. While water temperature and sediment levels are not at proper levels, other criteria are functioning well: The width-to-depth ratios of most streams – an important factor in ease of migration – currently "meet requirements for the bull trout," and the RHCA conditions are at or near late seral condition, an important factor in developing shade (to help lower water temperature) and increase pools, undercut banks, and woody debris (to increase food sources and hiding places). Moreover, the record shows that with regard to degraded areas, the Forest Service is making serious efforts to improve conditions.

Certainly there are mixed signals on recovery of bull trout in the Mill Creek allotment. The grazing plan essentially continues past grazing levels with some additional protections. The FWS was therefore faced with a difficult and complex decision requiring application of its expertise. It concluded that strong areas would

**Memorandum Decision – page 15**

continue to improve and degraded areas would not degrade further – in other words, there would be no diminishment of critical habitat. When the FWS uses its expertise in situations like this – where many factors point in different directions – the case law cited above requires this Court to give deference to the agency. Under these circumstances, the Court cannot find that this decision is irrational or arbitrary and capricious.[2]

**Incidental Take Statement**

Section 9 of the ESA prohibits the take of threatened species without a special exemption. An "incidental take" is defined as a take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. If a BO concludes that the proposed action is not likely to jeopardize the species, but is likely to result in some take, the FWS must provide an "Incidental Take Statement" (ITS) that (1) specifies the amount or extent of the impact on the species, (2) specifies reasonable and prudent measures to minimize such impact, and (3) sets forth required terms and conditions. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

An ITS must "set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation." *Arizona Cattle Growers Ass'n v. FWS*, 273 F.3d 1229, 1249 (9th Cir. 2001). The trigger cannot be so vague that it does not contain measurable guidelines and fails to provide a clear standard for determining when the authorized level

---

[2] WWP raises similar arguments with regard to the Hawley Mountain allotment and the Court finds them without merit for the same reasons.

of take has been exceeded, or so broad that it could not adequately trigger reinitiation. *Wild Fish Conservancy v. Salazar,* 628 F.3d 513, 531 (9th Cir. 2010). WWP argues that there is no trigger in the FWS's ITS for Mill Creek.

The Mill Creek ITS authorized take in the form of a number of trampled bull trout redds, or egg nests. The duty to re-initiate consultation is triggered if more than 16 redds are destroyed. The problem faced by the Forest Service in monitoring red destruction is that the allotment is huge and many areas are difficult to access. Accordingly, the FWS allowed the Forest Service to use a sampling approach to estimate redd destruction.

Under that approach, the Forest Service is required to survey a representative large stream reach (i.e., a stream with a width greater than 15 feet) and a small stream reach (i.e., width less than 15 feet) in each pasture of the allotment that is grazed for longer than a week after August 15 to document any impacted bull trout redds. If the Forest Service finds trampled redds, it determines, using Table 7 in the BO, the percentage of potentially exposed redds that were trampled. FWS would consequently assume the same trampling rate for all streams of that type in the unit.

This standard recognizes the unique problems of monitoring redd destruction in a remote and large allotment, and uses the expertise of the agencies to craft a solution that works around those obstacles. It contains a clear trigger, and thus satisfies the criteria set forth in *Arizona Cattle Growers* and *Wild Fish,* cited above. The Court will dismiss WWP's challenges to the ITS in the Mill Creek BO.

**Actual Take of Bull Trout**

WWP alleges in its amended complaint that the Forest Service is taking bull trout through its inadequate management of grazing. There is, however, no evidence of an actual take. For this reason, WWP's taking claim under § 9 of the ESA must be dismissed.

**Conclusion**

For the reasons set forth above, the Court will grant the motions for summary judgment filed by the defendants and intervenors, and the Court will deny the motion filed by WWP. Pursuant to Rule 58(a), the Court will enter a separate Judgment.

DATED: September 29, 2014

B. Lynn Winmill
Chief Judge
United States District Court